A at Al Miners, number 518-0299. Are you ready Sandra? I represent Respondent Mother Jennifer Miller in this matter. This is a case where termination of parental rights has been found and I'm here today because I believe the system has failed these kids and the mother. The state was too quick to permanently sever that parent-child relationship. The entire purpose of the Juvenile Court Act is to protect the children, address the issues within the family while you're working towards reunification. It's a last resort to terminate the parental rights and sever that relationship between the children and the parents. The first point of assertion here where I've alleged error of the court was where they found lack of reasonable efforts by the mother to return the children within nine months after adjudication of neglect. This is taken under subjective standard. So subjectively what the mother did wasn't reasonable efforts in her situation. When you're looking at both that and the reasonable progress, I think it's appropriate to talk about them at the same time because the services were all the same for both situations. So if we go through the services, I believe it's appropriate to talk about those at the same time under that standard. In this case, adjudication was on March 29th of 2017 and I think it's important to point out to the court that there were issues early on in this case with the service providers. CARITAS was contracted by the Department of Children and Family Services to provide services in this matter. When this case came about, there had previously been an intact case in place. That intact case was not successful, fell apart, which led to the need for the opening of this official juvenile case. After that happened, they failed to redo the integrated assessment as necessary. The problem with not doing that integrated assessment is the integrated assessment is the tool that's used to determine what services are going to be ordered and that the parents need to complete. It went so far in this case that there was two different court dates set to review whether or not that integrated assessment was going to be completed by the service provider. This is at no fault of my client, the mother. She cooperated as soon as it was set up and I believe that's undisputed. On June 14th of 2017 and July 5th of 2017, they had still failed to do the integrated assessment. So on July 28th of 2017, a rule to show cause was set for hearing that had been filed against the agency for failure to do this integrated assessment provided to the court with a new service plan. Finally, on July 21st of 2017, a week prior to when it was set for hearing on that contempt issue, they completed the updated integrated assessment and a new service plan and filed it with the court. At that point, it becomes clear these are the services that need to be completed under these circumstances for my client. It's important to note that during this time frame, there was a different caseworker. July of 2017 is kind of a turning point in this case because that's when the caseworker that was there through the remainder of the case was assigned and that was a Morgan Zadellas. There were issues between my client and the first caseworker in regards to communication. For my client's testimony, she had trouble communicating and getting things completed. After this new caseworker was assigned, it wasn't right away that my client got her act together and got things going. It took her a while to do that, but then she started doing her services. In her own testimony, mom admitted that she had messed up in her own words and she admitted that she had messed up. She acknowledged it. She had, by the time we came to hearing on the, for fitness on March 16th of 2018, she had gotten into domestic violence and substance abuse and mental health, had those issues. It's a significant number because before the best interest hearing came around on May 4th of 2018, her counselor came and testified that she had completed all those services. Early on in the case, she had completed the parenting classes. Visitation was always a very positive thing in her case. She was always compliant with visitation. The only issue that she ever had in regards to the visitation was the fact that she did not provide snacks at some time, at some of these visits. What was the GAL's position at the fitness hearing? The GAL... Of course, I know the GAL would speak at the best interest hearing, but did the GAL take a role at the fitness hearing? The GAL did take a role and basically said I stand by the state and the state's argument and believe that would be in the best interest of the children. And you've got three or four grounds. It seems like one of them was conceded by the state, perhaps. And with one or two of the grounds, reasonable progress is the standard. Is that correct? One of the two, yes. You've got reasonable efforts and then reasonable progress. Reasonable efforts is a subjective standard and reasonable progress is your objective standard. Once you got to the best interest hearing, most of the services had been completed. There were still a couple of things that she was working on. But she had completed her substance abuse, her mental health, her domestic violence, her parenting classes. Visitation was going well. She was employed. She was cooperating with the Department of Children and Family Services. Housing, she had purchased a home under contract for deed and was working on that home doing some remodeling. But didn't she have a lot of positive drug tests? She had some positive drug tests early on. And if you look at it, her last positive drug test was in, I believe, May of 2017. After that, they don't even drug test her again until December of 2017. And then she was negative at that point. Was it meth? I'm sorry? Meth? Early on, yes. And she will admit, she said she messed up. And she didn't have positive drug tests early on. But that was prior to this new caseworker taking over. She did get discharged unsuccessfully at one point from the CRC counseling program where she was going. She had transportation money issues. She did not come from a very financially stable environment. She wasn't working at that point and did not have the resources. She didn't have reliable transportation. The place that she was trying to get her substance abuse done was over an hour drive away. It's a rural community. There was closer services, but there was money owed to that place. So she was unable to attend there until later on you will see in the case through the briefs that that fee was paid and she was able to attend those locally. And once she was able to attend them locally, she completed them. And she, her counselor would testify at that best interest hearing that even after she completed what was required of her, she continued to attend those counseling classes. When you're looking at the best interest hearing, you've got, you've got, they're all four children, but you all kind of have two separate subsets. You've got WG, and WG has a different father. And the reason we need to break them up is because when you're looking at the best interest, he was placed in a non-traditional, non-family placement. So he was in traditional foster care. The foster parents where he was placed were not even licensed at the time. So they could not state at that point that they were going to be able to adopt this child. So there was no harm in allowing the mother to continue to work their services and try to complete them. The other children had a different father and the goal with respect to that father was still return home. And so they weren't even working to, they hadn't filed termination against his rights, but hadn't returned the children to him either. He had not completed his services either. The standard in these cases is not whether all the services are completed, but that you're making reasonable progress and reasonable efforts. I think the error here is that they were looking at, and some of these when you're reading through them were rated unsatisfactorily for the mere fact that they weren't completed. Yes, at some point the parents have to complete these services, but when you're assessing these nine month time frames, you're looking at their progress and their effort, not their issues, and they were significant in the beginning, that when she got enrolled into the local community drug treatment facility, it was prior to the filing of the termination of parental rights. It was not after that petition was filed. And I think that is an important point to show that it wasn't after the nine month periods. It was on December 15th, so it was right before that return, because the nine months of adjudication was March 29th of 2017, so that would have taken it into December 29th of 2017. So yes, it was at the very, very tail end, but it was prior to that nine month period. When we're looking at the best interest, there was one other point that I wanted to hit on here, that the caseworker testified that these children wanted to go back, at least the older children that were able to verbally express this. W.G. was an infant, so I'm not including necessarily him in this statement, but the children wanted to return to mom. If they're unable to return to mom, they wanted to return to their father, but their first choice was to return to mom. There was testimony that the bonding between the mother and the children was significant and obvious, and that there was love shown between them. I think to terminate the parental rights of this mother, and to sever that relationship between these children, and the mother would be a travesty. What type of, I guess, visitation was allowed, I guess, in the latter stages of the proceeding? It remained as supervised throughout the entire proceeding. It never changed. So it did not increase at any point. It wasn't decreased, but it did not increase. There was some criticism that she was still in a relationship with the father, and did visits with the father of W.G., but the caseworker testified that she wanted to keep doing these visits with W.G., with the father, because then she got basically double visits. She got her own personal visit, but was allowed to visit as well during his time, which allowed her some more time with the child. Thank you, Counsel. Thank you. Counsel, may it please the Court. Kelly Stacey, appearing for the State of Illinois. Under the first issue raised by the Respondent is whether the trial court erred in finding the mother failed to make reasonable efforts toward the return of the minors in the first nine months following adjudication. And in this case, the adjudication occurred on March 29th of 2017, so that nine-month period, under a reasonable progress and reasonable efforts, ran from March 29th, 2017, to December 29th, 2017. At that nine-month mark, the Respondent had already stopped treatment for substance abuse and mental health treatment. She was rated unsatisfactory on both areas at the nine-month mark, and had only restarted services, so none of those were completed by that nine-month mark. The trial court probably found that the State had proved a lack of reasonable efforts. And Justice Moore asked about the drug screens. There were quite a number of drug screens in this case that were positive for methamphetamine, and there were a number of negative screens on March of 2017 through December 29th of 2017. And we're looking at March 29th positive for meth, 5-1-17 refused to provide a sample. And they're informed that a refusal can indicate a positive, so that's a risk that they take. 5-5-17 positive for meth, 5-15-17 positive for meth, 7-5-17 positive for meth, 7-28-17 positive for meth. There was only one negative, and that was on the 12-27-17 drug drop. But these, all of these drug drops and the failure to complete substance abuse treatment supports the trial court's finding of a lack of reasonable efforts, though the efforts put out by respondent mother are very minimal at best, and especially under the positive drug drops. I agree with counsel that a lot of reasonable progress and reasonable efforts track together because we're looking at the same nine-month time frame from adjudication to when that nine-month period ends. So the positive drug screens and failure to even complete a substance abuse assessment treatment in a timely manner supports the trial court's finding. The state will acknowledge that apparently, although it's not in the record, but apparently from the respondent's brief, she has completed some services, but it's after the point where criminal rights have already been terminated. So it's clear when this mom is motivated, she can look to complete services, but the legislature has established these nine-month parameters and allows the state to proceed under that failure to make that progress and essentially keeps the kids in limbo until she decides she's going to get her housing set up and substance abuse and domestic violence. But probably the biggest area of concern for the caseworkers that came out in the unfitness proceeding was the fact that respondent mother is maintaining a relationship with this William Geller, who is the perpetrator of domestic violence, and domestic violence has been a very huge issue for this mom. But domestic violence and substance abuse appear to track hand in hand, and they seem to me to be the largest areas of concern in this case because she's just not able to take care of seven children when she's got all this turmoil in her life. And the fact that she's done these things later, I agree it's to the credit that she has, but concurrent planning has to go on from the beginning and the agencies need to figure out where this child is going to best fit without leaving them in limbo. So despite the history of domestic violence at the time of the termination hearing, the respondent admitted she was still in a relationship with Mr. Geller. He's incarcerated right now, but I think if you look at the course of the way this case has come out, the trial court was entirely correct that the progress was not reasonable and neither were the efforts in that first nine months. Ultimately the trial court found that it was in the best interest of the minor for the respondent's parental rights to be terminated. The one child who's placed the youngest, Mr. Geller's son, is placed in traditional foster care. That's because the older six children are placed together in single placement with Mr. Aguilar, who is the biological father of all six of those children. By all accounts, there's nothing that he needed to do to improve in his case. He had completed all the services. He's got a suitable home for the children. He's employed. The children are bonded to him. They love him. And given what went on in this case and the fact that the mom just had these fits and starts, and again, the effort is so admirable because a lot of times we get cases where it appears as though the parents just take too long to get started and that's a factor for the legislature. But they reduced that original 12-month time frame to nine months under the recognition that those early formative years are very important for children. They're in a place where they're loved and protected and the state would respectfully ask you to affirm. Thank you, Your Honors. Thank you, Counsel. Rebecca? Just to, not to keep bringing up the drug test, but just to kind of clarify that, the issue with the drug test, there were several positives in the beginning, but after July 28th of 2017, Kertos drug tested her one time. The problem that you have there is on that December 17 drug test, she was negative. When she went to all her counseling, she was negative. She did not have a vehicle between July of 17 to December of 17 to prove to the court that she was not drug tested. And if you show up to court and you ask to be drug tested, they don't want to drug test you because they figure you're clean. There's no need for it. How's the scheduling of the drug testing? Like you said, you said she didn't have a vehicle, so was that part of the issue? She wasn't drug tested because she didn't come to the county courthouse or see her probation officer or an officer? And I apologize, when I say vehicle, I mean a mode of getting the drug testing done. And what I mean by that is it's random and it's at the discretion of the department. She doesn't, Ms. Miller has no control over when they do those random drops. And the fact that they didn't do any from July of 2017 to December of 2017, that's a failure on the state and the state. I mean, they didn't test against her from the very beginning of the case, which we're not arguing that she didn't mess up then, but they're not giving her the opportunity to show that she was getting her act together and she wouldn't have continued to test positive. She was accused at the initial fitness hearing by the state of being under the influence at that hearing. She immediately left that hearing and went to the hospital to be drug tested. We requested that she could be drug tested immediately, thereby probation, but the courthouse was closed as it was later into the evening that that hearing was concluded. So she went to the hospital and got documentation, which was provided and testified to in the best interest hearing that she was clean on that date. She had some ear infection problems, which caused some speech issues, but she's done everything that she could at that point to show that she was clean. So there's no proof, there's no evidence, there's nothing showing her to have been positive for any substances since July of 2017, well before the end of that nine-month period. The state argues that it's not in the record that she completed these services. I propose it is in the record because at that best interest hearing, the counselor came and she was referred to as Michelle because her last name was Miller as well. So to keep it clear for the record, we referred to her as Michelle. And Michelle testified that Ms. Miller had completed her substance abuse counseling, her domestic violence counseling, and her mental health counseling. And then she further testified that not only did she complete those services that were required, she was continuing to do extra and go above and beyond and had plans to continue with the counseling. So before that final, the second half of the termination process was completed, she had completed those services. In regards to Mr. Giller, my client did have a continuing relationship with him, however testified that if it came to it and she had to choose the children versus Mr. Giller, it was never, there was nothing in the service plan that was ever said to her that you have to terminate this relationship. That was never a requirement. So to hold that against her now because the state wasn't happy that she was still in that relationship when it was never said, and the caseworker had testified to that, you have to terminate this relationship, is not a fair and equitable thing to do to Ms. Miller. In regards to Mr., the six children being placed with the father they have been, it was after the end of these termination hearings, and that is not in the record, but at the time, and I just want to point this out, he was given longer to complete his services. He wasn't completed with his services at the time the termination hearing had went, the children were still raising. Thank you counsel for your arguments. We will take this matter under advisement and render a decision in due course.